# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF TEXAS

## GALVESTON DIVISION

| | | |
|---|---|---|
| **SPIRIT AND TRUTH FAMILY** | § | |
| | § | |
| **WORSHIP CENTER, INC.** | § | **Case No. 09-33890** |
| **Debtor** | § | |
| | § | **Chapter 11** |
| | § | |
| | § | |

### SPIRIT & TRUTH FAMILY WORSHIP CENTER, INC.'S DISCLOSURE STATEMENT, DATED SEPTEMBER 9, 2009

## *Table of Contents*

| | | |
|---|---|---|
| I. | INTRODUCTION | 2 |
| | A. Purpose of This Document | 2 |
| | B. Deadlines for Voting and Objecting; Date of Plan Confirmation | 2 |
| | C. Disclaimer | 3 |
| II. | BACKGROUND | 4 |
| | A. Description and History of the Debtor's Business | 4 |
| | B. Insiders and affiliates of the Debtor | 5 |
| | C. Management of the Debtor Before and During the Bankruptcy | 6 |
| | D. Events Leading to Chapter 11 Filing | 6 |
| | E. Significant Events During the Bankruptcy Case | 7 |
| | F. Projection Recovery of Avoidable Transfers | 9 |
| | G. Claims Objections | 9 |
| | H. Current and Historical Financial Conditions | 9 |
| III. | SUMMARY OF THE PLAN | 9 |
| | A. What is the Purpose of the Plan of Reorganization | 9 |
| | B. Unclassified Claim | 9 |
| | 1. Administrative Expenses | 9 |

        2.      Priority Tax Claims.................................................................... 10
    C.  Classes of Claims and Equity Interest ............................................ 10
        1.      Classes of Secured Claims ................................................... 10
        2.      Classes of Priority Unsecured Claims.................................. 12
        3.      Classes of General Unsecured Claims .................................. 12
        4.      Class of Equity Interest Holders .......................................... 13
    D.  Means Of Implementing the Plan ................................................... 13
        1.      Post-confirmation Management............................................ 14
    E.  Risk Factors .................................................................................... 15
    F.  Executory Contracts and Unexpired Leases .................................... 15
    G.  Tax Consequences of Plan............................................................... 15
IV. CONFIRMATION REQUIREMENTS AND PROCEDURES ............................ 16
    A.  Who May Vote or Object.................................................................. 16
        1.      What Is an Allowed Claim or an Allowed Equity Interest? ................ 17
        2.      What Is an Impaired Claim or Impaired Equity Interest?.................... 17
        3.      Who is not entitled to Vote ................................................... 17
        4.      Who Can vote in More Than One Class ................................. 18
    B.  Votes Necessary to Confirm the Plan .............................................. 18
        1.      Votes Necessary for a Class to Accept the Plan .................... 18
        2.      Treatment of Nonaccepting Classes...................................... 18
    C.  Liquidation Analysis........................................................................ 18
    D.  Feasibility........................................................................................ 19
        1.      Ability to Initially Fund Plan ............................................... 19
        2.      Ability to Make Future Plan Payments................................. 19
V.  EFFECT OF CONFIRMATION OF PLAN............................................................ 19
    A.  Discharge of Debtor......................................................................... 19
    B.  Modification of Plan ........................................................................ 19
    C.  Final Decree .................................................................................... 20
VI. OTHER PLAN PROVISIONS ............................................................................. 20

I.

## INTRODUCTION

This is the disclosure statement (the "Disclosure Statement") in the small business chapter 11 case of SPIRIT & TRUTH FAMILY WORSHIP CENTER, INC. (hereinafter "Spirit & Truth") (the "Debtor"). This Disclosure Statement contains information about the Debtor and describes the Plan of Reorganization the "Plan") filed by Spirit & Truth on September 9, 2009.   A full copy of the Plan is attached to this Disclosure Statement as Exhibit A. *Your rights may be affected.  You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney.  If you do not have an attorney, you may wish to consult one.*

The proposed distributions under the Plan are discussed at pages 9-13 of this Disclosure Statement. General unsecured creditors are classified in Classes 8 and 9, and will receive a distribution of Classes 8 and 9 will receive 100 % of their "allowed" claims to be distributed as follows:

Class 8 – Class 8 is impaired and will be paid in full within 90 days from the effective date of the Plan.  All creditors who wish to participate in Class 8 will have to the date of deadline to submit a ballot.

Class 9 – Class 9 is impaired and will be paid in equal quarterly payments on a pro rata basis; commencing 120 days from the effective date of the plan over a period of time not exceed 60 months.  Any creditor in Class 9 may elect to be treated as a Class 8 creditor by indicating said treatment on the ballot.

A.      **Purpose of This Document.**

This Disclosure Statement describes:

- The Debtor and significant events during the bankruptcy case,
- How the Plan proposes to treat claims or equity interests of the type you hold (*i.e.*, what you will receive on your claim or equity interest if the plan is confirmed),
- Who can vote on or object to the Plan,
- What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan,
- Why Spirit & Truth believes the  Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation, and
- The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement.  This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

B.      **Deadlines for Voting and Objecting; Date of Plan Confirmation**

The Court has not yet confirmed the Plan described in this Disclosure Statement.  This section describes the procedures pursuant to which the Plan will or will not be confirmed.

1.      A hearing has been set for the _____ day of _____, 2009, at _____ .m. in Courtroom No. 400, 4th Floor, 515 Rusk St., Houston, Texas 77002 to approve the Disclosure Statement and the proposed Plan.

2.      The Deadline for voting for or against the Plan is the _____ day of _____, 2009.

If you are entitled to vote to accept or reject the plan, vote on the enclosed ballot and return the ballot in the enclosed envelope to J. Craig Cowgill & Associates, P.C., 8100 Washington, Suite 120, Houston, TX. 77002.  See section IV.A. below for a discussion of voting eligibility requirements.

Your ballot must be received by no later than 10 days prior to the hearing on the confirmation of the Plan or it will not be counted.

3.      The last day to file an objection to the Disclosure Statement and Confirmation of the Purposed Plan is the _____ day of _____, 2009.

Objections to this Disclosure Statement or to the confirmation of the Plan must be filed with the Court and served upon J. Craig Cowgill & Associates, P.C., 8100 Washington, Suite 120, Houston, TX. 77002 and Spirit & Truth at P. O. Box 1539, League City, TX. 77575.

4.      Please contact the office of J. Craig Cowgill, attorney for the Debtor for additional information regarding the contents of the Disclosure Statement and the proposed Plan.

If you want additional information about the Plan, you should contact the law firm of J. Craig Cowgill & Associates, P.C. at 713/956-0254.

C.      **Disclaimer**

*The Court has [conditionally] approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted. [The Court's approval of this Disclosure Statement is subject to final approval at the hearing on confirmation of the Plan.  Objections to the adequacy of this Disclosure Statement may be filed until _____ a time fixed for filing objections and the hearing to consider confirmation of a Chapter 11 Plan and Disclosure Statement. Such notice shall not be less than 25 days notices to parties in interest pursuant to § 1125(f) and Rule 2002(b.)*

*hearings and deadlines to be set by the Bankruptcy Court and will be noticed to all parties

## II.
## BACKGROUND

### A.    Description and History of the Debtor's Business

Spirit and Truth Family Worship Center, Inc. was incorporated as a non-profit organization on January 26, 1999.  The  logo was simply…*"EQUIPPING BELIEVERS TO DO THE WORK OF MINISTRY".*

The ministry originally began with Pastor *Edwin LaMar Bamberg* and wife, Pastor *Alma Bamberg* who continues in the work of the Lord today.  They believe they are called to pastor a church that is God-centered, purpose driven and people empowering, with an understanding that they are to feed the flock of God with knowledge and understanding.  The ministry teaches spiritual principles that lead to salvation and the acquisition of skills that promote self-determination, hope, expectation, abundance and life prosperity in an excellent manner.

The goal can and will be accomplished through PROJECT U-TURN, the outreach ministry arm of the church.  PROJECT U-TURN IS THE Debtor's official state of Texas recognized 501 c3 Community Development Corporation.

The mission of PROJECT U-TURN is "how" the Debtor implements the outreach component of the vision of Spirit & Truth.  The benefits of the programs of PROJECT U-TURN to the community is why the Debtor is working so diligently to complete the facility, thus allowing maximum impact to the community it serves.

### WHAT IS PROJECT U-TURN?

Project U-Turn is an organized and structured way to access federal government assistance via GRANTS AND CHARITABLE GIFTS;

It facilitates the "DO" in the vision statement to "Equip Believers to DO the Work of the Ministry".

It is the "DO"-ing Arm of the Church to the community and its services can ultimately become the "*bait"* to lead souls to Christ.

### The Project U-Turn Programs and Services:

**Food Bank** – which consists of community food pantry distributions;

**Clothing Bank** - consisting of clothing distributions, baby clothes and supplies, school uniforms, and back to school Bash (School Supplies).

**Blazing Arrows Ministry** – which consists of college tour, scholarship banquet, school of the entrapaneir and financial fitness (credit education).

**Vocational Education** – which consists of cooking/food service preparation, restaurant management, cosmetology/barber training school and GED Certification.

**Boys/Girls Mentoring Program -** which consist etiquette training, abstinence education (True Love Waits), and Character Education;

**After School Program –** which consists of Microsoft certified technology center and tutoring program;

**Health/Nutrition Education –** which consists of food distribution and medical education, fitness training, exercising classes, health screening, blood pressure and glucose screening;

**Fine Arts Component -** which consists of music, poetry, dance and drama;

**Sports Component -** which consists of basketball, soccer, track and field.


B.      **Insiders and affiliates of the Debtor**

*Pastor Edwin LaMar Bamberg:*

Pastor Edwin LaMar Bamberg was born in Charleston, South Carolina.  He hold a Bachelor and a Master Degree in Speech Language Pathology from South Carolina State University and a Mid-Management Degree from Texas Southern University.  Pastor Bamberg was employed as a Speech Language Pathologist, Special Education Teacher, Assistant Principal, and Principal by the Galveston Independent School District for twelve (12) years.  He has been married to Alma Gordon Bamberg for twenty (20) years.

In 1989, he accepted the call to the ministry office of teacher and was ordained as an Elder in 1993 under Bishop R. E. Woodard, Sr.  He became a member of Compton Memorial Church of God In Christ and served as Administrative Assistant to Bishop R. E. Woodard, Jr. and a faithful Bible Study Teach for nine (9) years.

In 1996, his beliefs lead him to establish a church that would teach biblical principles of faith and promote self-determination, hope, and prosperity to glorify God.  Through the establishment of this Church, Pastor Edwin Bamberg would create a church culture that would be God-centered, purpose driven, and people empowering.  In December of 1996, he co-founded Spirit & Truth Family Worship Center along with his wife, Pastor Alma Bamberg.

In 2001, Pastor Edwin Bamberg was ordained as a Minister of the Gospel through New Light Christian Center Church and became a member of the Auxiliary of Independent Ministries.  He graduated from the Abundant Life School of Ministry in 1999 and Truth Bible Institute in 2006, where he currently serves as a co-founder and President.

*Pastor Alma Bamberg:*

Alma Gordon Bamberg was born in Baton Rouge, Louisiana.  She received a Bachelors of Science Degree from Southern University in Baton Rouge, Louisiana graduating Magna Cum Laude of the Colleges

Colleges of Sciences. She was employed by IBM Houston, Galveston ISD, Galveston Housing Authority, and self-employed business owner of Total Woman Boutique. She is currently married to Pastor Edwin Bamberg.

Alma Bamberg received Jess Christ as her Lord and Savior at a very young age and has been involved in various aspects of ministry since childhood. An avid seeker for the things of God, Pastor Alma is a graduate of Abundant Life School of Ministry and Truth Bible Institute.

In 1990, Pastor Alma accepted the full-time ministry office of Evangelist. She was ordained as a Minister of the Gospel through New Light Christian Center Church in 2001 and is a member of Auxiliary of Independent Ministries. In 1997, she co-founded Spirit & Truth Family Worship Center Church in League City, Texas where she serves as co-pastor along with here husband who is the senior pastor. Pastor Alma along with her husband has established a Bible School, Truth Bible Institute, where she serves as Vice-President.

As co-founder of Dominion Team Ministries, Pastor Edwin and Alma Bamberg are committed to teaching and preaching the Word of God to a *hurting* and *lost* generation. They have an unwavering commitment to *"Equip Believers to DO The Work Of Ministry"* by establishing a church that is God Centered, Purpose Driven and People Empowering. Pastor Alma is also a conference and seminar speaker, who enjoys ministering to women.

She is the founder of Sisters of Destiny Women's Ministry which began in 1998. Pastor Alma's passionate desire for women is exemplified as she focuses on exhorting women in the area of wholeness. It is her desire to see the women of God '…enjoy life, and have it in abundance, to the full…'

Pastor Edwin Bamberg receives an annual salary of $43,550.00 and a housing annual expense of $55,535.48 (before taxes). Pastor Alma Bamberg receives an annual salary of $29,250.00 and a housing annual expense of $41,235.48 (before taxes). Both Pastor Edwin and Pastor Alma will continue to receive the same compensation during the pendency of this chapter 11 case.

## Management of the Debtor Before and During the Bankruptcy

Pastor Edwin Bamberg will continue as the President and will serve as the senior pastor of the Church along with Pastor Alma who will also continue to act of Vice-President and will continue to serve as co-pastor of the Church during the pendency of this Chapter 11. It is anticipated, as set forth above, that they will continue to receive their annual salaries and housing expenses.

After the effective date of the order confirming the Plan, the directors, officers, and voting trustees of the Debtor, any affiliate of the Debtor participating in a Plan will be: Pastor Edwin and Pastor Alma. The responsibilities and compensation of these Post Confirmation Managers will remain the same.

## D.      Events Leading to Chapter 11 Filing

On or about May, 2005 the principals of the Debtor retainer the services of One Capital Advisor, Inc. At the time of the Loan application the Borrower was to pay Lender an application fee of $750.00.

On February 13, 2006, a Construction Loan Agreement was made and entered into by and between Foundation Capital Resources, Inc. a Georgia corporation and Spirit & Truth Family Worship Center, a Texas non-profit corporation.  The loan amount was $2,150,000.00 at 8.25% per annum; adjusted every three (3) years thereafter to a rate equal to the Prime Rate then in effect, plus three percent (3%) per annum (the "Adjusted Rate").  At no time was the Adjusted Rate to be less than 8.25%.

Spirit & Truth diligently pursue the construction to complete the new home of the worship center. Through no fault of the principals of the Debtor, major problems developed in the construction of this new facility and the deadline for completion was unable to be meet.

Because the construction deadlines could not because of the actions of certain subcontractors it was necessary to bring in the Debtor's sister church to attempt in resolving the financial deadlines.  Spirit & Truth became quickly aware of the intricate problems associated with the construction of their project.  For example, certain subcontractors' employees was arrested due to the stealing of material and supplies delivered at the facility.  Numerous problems arose involving the City Inspectors permission for completion of a certain phase of the project.  This resulted in various economical losses to the Debtor.

The Debtor was further impacted due to the delay in construction because of the tow major hurricanes that hit the Texas Gulf coast forcing the construction site to be completely shut down for extensive period of time.  Negotiations were ongoing between the Debtor and its sister church, New Light Christian Center Church, regarding the aforementioned issues involving the Debtor's ability to finance the church's operation and complete the construction of the new worship facility.  Due to the problems set forth above, the financial issues brought the construction project to a stand still.  The financial issues were exacerbated by the problems associated with the economical downturn accompanying the two major hurricanes.  However, the good new is that the Debtor is recovering and pursuant to the interim plan that was implemented, has been able to make the promised payment of $30,000.00 and $20,000.00, respectively, to Foundation Capital.

It was the belief of the Debtor and its sister church that Foundation Capital was willing to work with it and allow the Debtor an opportunity to regroup so that this project could be completed for the mutual benefit of all parties.  This was not the case; however, and the Debtor's note was accelerated and posted for foreclosure.  This action forced the Spirit & Truth into bankruptcy in an effort to protect its assets.

E.     **Significant Events During the Bankruptcy Case**

On June 1, 2009, Spirit & Truth filed for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code.  The initial Debtor's conference was originally set for June 18, 2009 but was reset until July 8, 2009.  The first meeting of creditors was conducted on July 9, 2009 at 10:00 a.m.

On or about June 15, 2009, the Debtor filed its Application for Authority to Employ J. Craig Cowgill as lead attorney of the Debtor.  The Order Authorizing the Employment of J. Craig Cowgill was entered by the Court on July 13, 2009.

The Debtor filed its first Monthly Operating Report on July 22, 2009.  The July's Monthly Operating Report is in the process of being filed with the Court.

Through the strong believes and faith it is the congregation and the pastors hope that the Debtor is afforded an opportunity to reorganize and amicable work with its primary Lender in achieving working capital to partial complete a section of the new church facility to allow it to reduce its monthly operating expenses by about $18,000.00.  The Debtor proposes to make adequate protection payments to the Lender once it relocates to the new facility.  Given this opportunity it is the belief of the church that both Foundation Capital and the Church will be the initial "winners".  The simply method would have been too simply walk from the project; however, through the hopes and beliefs of their ministry and the belief of their congregation this was not an option.

New Light Church's Board of Directors has reviewed the construction budget offered by Foundation Capital and have concluded that the construction costs are somewhat inflated.  This conclusion is based upon New Light's experience in completing their construction projects.  New Light Church has it own construction company engaged exclusively to build and renovate properties for their church. Consequently, they are more than familiar with what it takes to complete project of this magnitude.

If permitted, the Board of Directors has agreed to allow its church's construction department to get involved in the completion of this project.  It is the opinion of the Debtor and its congregation that such involvement will lead to economic savings of this project which will accrue to both Foundation Capital and the Debtor's benefit.

New Light Church's construction company will serve as General Contract and assume responsibility for completing the construction project using the present budget as a guide.  Foundation Capital Resources can elect to pay all subcontractors directly for work done on the construction project.

Foundation Capital Resources will provide funds to complete the project under agreed construction funding terms and using the construction budget (minus 10%) as the maximum budget for the project.

Spirit & Truth will make monthly payments of $20,000.00 during the remainder of the construction period.  Foundation Capital Resources will restructure the Note by making the balance of the remaining arrearage a balloon payment which will be due at the end of the Note's term or incorporate the balance into revised mortgage.

Upon completion of the construction, Foundation Capital Resources will agree to offer Spirit & Truth a mortgage at an acceptable, reasonable interest rate.  Spirit & Truth will make interest only payments to Foundation Capital Resources for the first five (5) years after the building is completed and occupied sot that Spirit & Truth will have the time needed to stimulate growth in the congregation and increase giving and donations.

New Light Church will execute a document to purchase Spirit & Truth's worship facility in the event that Spirit & Truth defaults on the loan commitment during the first 60 months.  In the event of a default and purchase by New Light Church, Foundation Capital Resources agrees to finance the purchase price at an acceptable and reasonable interest rate.

F.      **Projected Recovery of Avoidable Transfers**

The Debtor is unaware of avoidable transfers at this time.

G.      **Claims Objections**

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims.  Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld.  The procedures for resolving disputed claims are set forth in Article V of the Plan.

H.      **Current and Historical Financial Conditions**

The fair market value of the estates assets are listed in Exhibit B of its Schedules.  The principal of the Debtor-in-Possession is basis for the determination of fair market value based upon the appraisal report and insurance coverage. The Debtor's most recent financial statements issued before bankruptcy, each of which was furnished to the U. S. Trustee's office at the initial U.S. Trustee interview which was conducted on July 8, 2009.

The most recent post-petition operating report filed since the commencement of the Debtor's bankruptcy case are set forth in Exhibit "C" and incorporated herein

### III.
### SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

A.      **What is the Purpose of the Plan of Reorganization?**

As required by the Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive.  The Plan also states whether each class of claims or equity interests is impaired or unimpaired.  If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

B.      **Unclassified Claims**

Certain types of claims are automatically entitled to specific treatment under the Code.  They are not considered impaired, and holders of such claims do not vote on the Plan.  They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code.  As such, the Plan Proponent has *not* placed the following claims in any class:

    1.      *Administrative Expenses*

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case which are allowed under § 507(a)(2) of the Code.  Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition.  The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists the Debtor's estimated administrative expenses, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|------|----------------------|--------------------|
| Expenses Arising in the Ordinary Course of Business After the Petition Date | 50,000.00 | Paid in full on the effective date of the Plan, or according to terms of obligation if later |
| The Value of Goods Received in the Ordinary Course of Business Within 20 Days Before the Petition Date | 0.00 | Paid in full on the effective date of the Plan, or according to terms of obligation if later |
| Professional Fees, as approved by the Court. | 35,000.00(including the $25,000.00 retainer paid) | Paid in full on the effective date of the Plan, or according to separate written agreement, or according to court order if such fees have not been approved by the Court on the effective date of the Plan |
| Clerk's Office Fees | 0.00 | Paid in full on the effective date of the Plan |
| Other administrative expenses | 0.00 | Paid in full on the effective date of the Plan or according to separate written agreement |
| Office of the U.S. Trustee Fees | 1950.00 | Paid in full on the effective date of the Plan |
| TOTAL | 61,950.00(exclusive of the 25,000.00 retainer) | |

      2.    *Priority Tax Claims*

      None known at this time.

**C.    Classes of Claims and Equity Interests**

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

      1.    *Classes of Secured Claims*

Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code. If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will [be classified as a general unsecured claim].

Spirit & Truth's Disclosure Statement 11

The following chart lists all classes containing Debtor's secured prepetition claims and their proposed treatment under the Plan:

Claims and interests shall be treated as follows under this Plan:

| | Impairment | Treatment |
|---|---|---|
| Class 1 - Priority Claims | unimpaired | "Class 1 is unimpaired by this Plan, and each holder of a Class 1 Priority Claim will be paid in full, in cash, upon the later of the effective date of this Plan as defined in Article VII, or the date on which such claim is allowed by a final non-appealable order. |
| Class 2 -- Secured Claim of Foundation Capital | impaired | "Class 2 is impaired and will be treated to the extent of the allowed secured claim under §506 of the Code.1 |
| Class 3 - Secured Claim of Konica Minolta | unimpaired. | "Class 3 is unimpaired and will be paid in the normal course of the contract. The appropriate monthly payment of this claim is for the copier used by the Church. The approximate monthly payment is $678.19. |
| Class 4 - Secured Claim of Pitney Bowes | unimpaired | "Class 4 is unimpaired and will be paid in the normal course of the contract. The appropriate monthly payment of this claim is for the postage machine used by the Church. The approximate monthly payment is $31.05. |
| Class 5 -- Secured Claim of Fikes | Unimpaired | "Class 5 is unimpaired and will be paid in the normal course of the contract. The appropriate monthly payment of this claim is for the air freshener service used by the Church. The monthly service charge is $96.40. |

---

1 The treatment of the claim of Foundation Capital will be set forth at the end of Article IV.

| Class 6 – Secured Claim of First Data | Unimpaired | "Class 6 is unimpaired and will be paid in the normal course of the contract. The appropriate monthly payment of this claim is for the use of the credit card machine for use of the Church. The monthly service charge is $30.20. |
| Class 7 – Secured Claim of Cornerstone Management | Unimpaired | "Class 7 is unimpaired and will be paid in the normal course of the contract. This claim is for the month to month lease space currently occupied by the Church. The month to month lease payments will be made pursuant to the ordinary course of business until such time as the Church can obtain partial occupancy of the new facility. The monthly lease payment is $5,142.50. |

2.    *Classes of Priority Unsecured Claims*

None known at this time.

3.    *Classes of General Unsecured Claims*

General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code unless it has been approved by the Court as reasonable and necessary for administrative convenience.

The following chart identifies the Plan's proposed treatment of Classes 8 through 9, which contain general unsecured claims against the Debtor:

| Class 8 –Unsecured Claims of Creditors under $500.00 | impaired | "Class 8 is impaired and will be paid in full within 90 days from the effective date of the plan. All creditors who wish to participate in Class 8 may chose to do so by indicating such treatment on the ballot. |

| Class 9 – Unsecured Claim of Creditors over $501.00 | impaired | "Class 9 is impaired and will be paid in equal quarterly payments on a pro rata basis, commencing on the 120th day from the effective date of the plan. Payments to be made on quarterly on a pro rata basis.  Any creditor wishing to accept the treatment of Class 8 may do so by electing Class 8 treatment on the ballot. |
|---|---|---|

4.      *Class of Equity Interest Holders*

Equity interest holders are parties who hold an ownership interest (*i.e.*, equity interest) in the Debtor.  In a corporation, entities holding preferred or common stock are equity interest holders.  In a partnership, equity interest holders include both general and limited partners.  In a limited liability company ("LLC"), the equity interest holders are the members.  Finally, with respect to an individual who is a debtor, the Debtor is the equity interest holder.

The following chart sets forth the Plan's proposed treatment of the class of equity interest holders.

| Class 10 – Equity Shareholders of the Debtor | Impaired | "Class 10 is impaired and consists of all equity shareholders of the Debtor.  The equity shareholders are not anticipated to receive any distribution unless all allowed claims have been paid in full. |
|---|---|---|
| Pastor          Edwin Bamberg | 50% | |
| Pastor          Alma Bamberg | 50% | |

D.      **Means of Implementing the Plan**

Spirit and Truth Family Worship Center, Inc. (hereinafter referred to as "Spirit & Truth") is a non-profit organization set up to help each person experience salvation through Jesus Christ and develop the acquisition of skills that promotes self-determination, hope, and prosperity in an excellent manner.  Spirit & Truth is a sister church of the New Light Christian Center Church.  It is a member of the Association of Independent Ministries, Inc.  Those various financial issues the construction project of the new facility came to a stand still.  Spirit & Truth's financial issues were exacerbated by the problems associated with the economic downturn and the 2 major hurricanes that impacted the Houston area.  From a financial standpoint, the effect of those events severely crippled the completion of this facility.

In view of Sprit & Truth's financial condition, it is very clear that New Light Church's Board of Directors have agreed to assist in the completion of the building of the new facility and implementation of a plan involving the cooperation on the part of Foundation Capital Resources.

Spirit & Truth will institute an annual capital campaign to raise $300,000-$400,000 over the next three (3) years above regular tithes and offerings to complete the construction project.

Spirit & Truth will work in conjunction with New Light Christian Center Church's Construction Department to complete the project over the next five (5) years.

Spirit & Truth congregants have committed to provide some of the labor necessary to finish the project.  Spirit & Truth will secure all subcontractors to complete all work that the congregants are unable to complete.

1.    *Post-confirmation Management*

The Post-Confirmation Managers of the Debtor, and their compensation, shall be as follows:

| Name | Affiliations | Insider (yes or no)? | Position | Compensation |
|------|-------------|---------------------|----------|-------------|
| Edwin Bamberg | President | Yes | Senior pastor | $39,992.50 + ($45,962.25 housing expense) |
| Alma Bamberg | Vice-President | Yes | Co-pastor | $26,437.50 + ($32,762.25 housing expense) |
| | | | | |

E.    **Risk Factors**

The proposed Plan has the following risks:

The risk factors that might affect the Debtor's ability to make payments under the Plan will be the health of the pastors, financial risk associated with construction and the problems associated with the economic downturn of the Houston economy. The Debtor must have sufficient resources to market its ministry programs.  Spirit & Truth must be able to effectively manage the construction of its new facility and have sufficient time to expand and grown in the community.  The Plan contemplates Spirit & Truth as capable of paying it's creditors within five (5) years or sooner.

F.    **Executory Contracts and Unexpired Leases**

The Plan, in Exhibit 5.1, lists all executory contracts and unexpired leases that the Debtor will assume under the Plan.  Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any.  Exhibit 5.1 also lists how the Debtor will cure and compensate the other party to such contract or lease for any such defaults.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

All executory contracts and unexpired leases that are not listed in Exhibit 5.1 will be rejected under the Plan.  Consult your adviser or attorney for more specific information about particular contracts or leases.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

***The Deadline for Filing a Proof of Claim Based on a Claim Arising from the Rejection of a Lease or Contract Is October 7, 2009.***  Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

G.    **Tax Consequences of Plan**

***Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.***

The Debtor believes that the following discussion generally set forth the federal income tax consequences to creditors upon confirmation and consummation of the Plan. No ruling has been sought or obtained by the Debtor from the Internal Revenue Service (the "IRS") with respect to any of these matters. The following discussion of the federal income tax consequences is not binding on the IRS and is general in nature. No statement can be made herein with respect tot the particular federal income tax consequences to any particular creditor.

AS A RESULT OF THE COMPLEXITY OF THE APPLICABLE PROVISIONS OF THE INTERNAL REVENUE CODE, EACH CREDITOR IS URGED TO CONSULT ITS OWN TAX ADVISOR TO ASCERTAIN THE ACTUAL TAX CONSEQUENCES TO IT, UNDER FEDERAL AND APPLICABLE STATE AND LOCAL LAWS, OF CONFIRMATION AND CONSUMMATION OF THE PLAN.

Creditors may be taxed on distributions, if any, they receive under the Plan. The amount of the income or gain, and its character as ordinary income or capital gain or loss, as the case may be will depend upon the nature of the claim of each particular creditor. The method of accounting utilized by a creditor for federal income tax purposes may also affect the tax consequences of a distribution. In general, the amount of gain (or loss) recognized by such creditor distributed will be the difference between (i) the creditor's basis for federal income tax purposes, if any, in the claim and (ii) the amount of the distribution received. Whether the distribution will generate ordinary income or capital gain will depend upon whether the distribution is in payment of a claim or any item which would otherwise generate ordinary income on the one hand, or in the payment of a claim which would constitute a return of capital on the other hand.

The information is not available to estimate the full amount of tax attributes which will remain after the Effective Date of the Plan. However, based upon the information which is available to the Debtor, it is believed that upon consummation of the Plan and the transactions of the Debtor contemplated thereby, no material federal income tax liability will be created, except that which is specifically disclosed herein. Under the Internal Revenue Code, the taxpayer must include in gross income the amount of any discharge of any indebtedness during the year. However, Section 10a of the Internal Revenue Code provides that if a taxpayer is under the jurisdiction of the Court in a case under the Bankruptcy Code, and the discharge is grated by the Bankruptcy Code or pursuant to a plan approved by the Bankruptcy Court, the income from such discharge is not recognized currently as gross income, but rather is applied in reduction of certain tax attributes of the Debtor, including net operating losses, general business credits, capital loss carry forwards, adjusted basis in property, and foreign tax credit. The reduction of tax attributes is made after the determination of federal income tax for taxable year of discharge, and the reduction of an adjusted basis generally are limited to the excess of the attributes available for reduction is not reported as gross income.

## IV.
## CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code. These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible. These requirements are not the only requirements listed in § 1129, and they are not the only requirements for confirmation.

### A.      Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan Proponent believes that classes 2, 8, 9 and 10 are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan. The Plan Proponent believes that classes 1, 3,45,6 and7 are unimpaired and that holders of claims in each of these classes, therefore, do not have the right to vote to accept or reject the Plan.

1. *What Is an Allowed Claim or an Allowed Equity Interest?*

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

**The deadline for filing a proof of claim in this case was _October 7, 2009._**

2. *What Is an Impaired Claim or Impaired Equity Interest?*

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is *impaired* under the Plan. As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

3. *Who is **not** entitled to Vote?*

The holders of the following five types of claims and equity interests are *not* entitled to vote:

- holders of claims and equity interests that have been disallowed by an order of the Court;

- Holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes.

- holders of claims or equity interests in unimpaired classes;

- holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code; and

- holders of claims or equity interests in classes that do not receive or retain any value under the Plan;

- administrative expenses.

- ***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan [and to the Adequacy of the Disclosure Statement].***

    4.     *Who Can Vote in More Than One Class*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

**B.    Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes, as discussed later in Section [B.2.].

    1.     *Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

    2.     *Treatment of Nonaccepting Classes*

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by § 1129(b) of the Code. A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan. The Code allows the Plan to bind nonaccepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a) (8) of the Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

***You should consult your own attorney if a "cram down" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.***

**C.    Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. A liquidation analysis is attached to this Disclosure Statement

Statement as Exhibit D.

## D.  Feasibility

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

### 1.  *Ability to Initially Fund Plan*

The Plan Proponent believes that the Debtor will have enough cash on hand on the effective date of the Plan to pay all the claims and expenses that are entitled to be paid on that date.

### 2.  *Ability to Make Future Plan Payments And Operate Without Further Reorganization*

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments.  The Plan Proponent has provided projected financial information. Those projections are listed in Exhibit "E" and incorporated herein.

The Plan Proponent's financial projections show that the Debtor will have an aggregate annual average cash flow, after paying operating expenses and post-confirmation taxes, of $400,000.00. The final Plan payment is expected to be paid on December, 2013.

*You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.*

## V.
## EFFECT OF CONFIRMATION OF PLAN

## A.  DISCHARGE OF DEBTOR

Discharge.  On the effective date of the Plan, the Debtor shall be discharged from any debt that arose before confirmation of the Plan, subject to the occurrence of the effective date, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor shall not be discharged of any debt (i) imposed by the Plan, (ii) of a kind specified in § 1141(d)(6)(A) if a timely complaint was filed in accordance with Rule 4007(c) of the Federal Rules of Bankruptcy Procedure, or (iii) of a kind specified in § 1141(d)(6)(B).  After the effective date of the Plan your claims against the Debtor will be limited to the debts described in clauses (i) through (iii) of the preceding sentence.

## B.  Modification of Plan

The Plan Proponent may modify the Plan at any time before confirmation of the Plan.  However, the Court may require a new disclosure statement and/or revoting on the Plan.

"The Plan Proponent may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Court authorizes the proposed modifications after notice and a hearing."]

C.      **Final Decree**

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Plan Proponent, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.

# VI.
# OTHER PLAN PROVISIONS

Notwithstanding confirmation of the Plan, the Court will retain jurisdiction (i) to determine the allowance of claims upon objection by a party-in-interest; (ii) to determine requests for payment of administrative claims and expenses, including compensation, entitled to priority under Section 507(a)(1) of the Bankruptcy Code; (iii) to resolve disputes regarding interpretation of the Plan; (iv) to modify the Plan; (v) to implement provisions of the Plan; (vi) to adjudicate any cause of action brought by the Debtor or Trustee as representatives of the estate; (vii) to enter a final decree; and (viii) for other purposes.

The Debtor has filed as part of its schedules a list of all creditors, setting forth the identity of each creditor and an indication of the amount due each creditor.  Unless a claim is listed as disputed, contingent or unliquidated, each creditor's claim will be allowed in the amount and status stated on the Debtor's schedules.

Claims listed as **disputed, contingent, or unliquidated** will not be allowed unless a proof of claim with all supporting documents was filed prior to the deadline for filing Proof of Claims.  In the event a creditor has filed a proof of claim in these proceeding with which the Debtor disagrees, the Debtor has the option to file an objection that claim and request the Court to determine the allowed amount of the claim.  The Debtor shall attempt to resolve all objections to claims prior to confirmation. However, the Debtor shall have 60 days from the Effective Date to file objections to claims

Any proof of claim for debt listed on the Debtor's schedules as **disputed, contingent, or unliquidated** which is not timely filed shall be of **no force and effect**.  No distribution will be made to any creditor that has not timely complied with this provision.

Injunction:  Except as otherwise provide in the Plan or the Confirmation Order, the entry of the Confirmation Order, as of the Effective Date of the Plan, will act as complete discharge of all Claims against the Debtor of any nature at all, including, without limitation, any liability of a king specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, that arose, or has been asserted against the Debtor anytime before the Effective Date or that arises from any pre-confirmation conduct of the Debtor whether or not the Claim is known to or knowable by the current or any former holder of the Claim  . The discharge of the Debtor will be effective as to each Claim, whether or not the holder of the Claim voted to accept the Plan. In addition, the Confirmation Order will operate as a general resolution with prejudice, as of the Effective Date, of all pending legal proceedings, if any, against the Debtor and the

Debtor and the Reorganized Debtor and their assets and properties and any proceedings not yet instituted against the Debtor and the Reorganized Debtor or their assets and properties with respect to any matter arising before the Confirmation Date, except as otherwise provided in the Plan. Unless otherwise provided in the Plan or by order of the Bankruptcy Court, all injunctions or automatic stays provided for in this case pursuant to section 105, if any, or section 362 of the Bankruptcy Code, or otherwise, and in existence on the confirmation date will remain in full force and effect until the Effective Date.

SPIRIT & TRUTH FAMILY WORSHIP CENTER

By:/s/**Pastor Edwin L. Bamberg**
Pastor Edwin L. Bamberg, President

OF COUNSEL:

J. CRAIG COWGILL & ASSOCIATES, P.C.

By:/s/**J. Craig Cowgill**
J. Craig Cowgill
State Bar No. 04929000
8100 Washington, Suite 120
Houston, Texas 77007
713/956-0254 (telephone)
713/956-6284 (fax)

# <u>SUMMARY OF EXHIBITS</u>

A.     Plan of Reorganization

B.     B-2 Assets of the Debtor

C.     Latest Monthly Operating Report

D.     Liquidation Analysis

E.     Five (5) Year Projected Budget